A90A0027. PIEDMONT ENGINEERING & CONSTRUCTION CORPORATION v. BALCOR PARTNERS-84 II, INC. et al.
(396 SE2d 279)

BEASLEY, Judge.

Plaintiff Piedmont Engineering & Construction Corp. (Piedmont), f/k/a Park Colony Apartments, Inc. (Colony Apartments), and f/k/a Park Lake Apartments, Inc. (Lake Apartments) appeals the denial of summary judgment to it and the grant of summary judgment to defendants Balcor Partners-84 II, Inc. (Balcor Partners), BRI Partners-81 (BRI), and Balcor Property Management, Inc. (Balcor Management) (all being Balcor Company affiliates). Two suits were consolidated below. They sought to recover almost two million dollars in what Piedmont contends were real estate brokerage commissions and property management fees illegally obtained by defendants in the construction and sale of two apartment complexes and the management of one. The claims of illegality are that defendants were not

licensed in Georgia as real estate brokers at all times pertinent. The Georgia Association of Realtors, Inc. and the Real Estate Securities and Syndication Institute and its Georgia Chapter filed amicus curiae briefs.

An explanation of the parties' business relationships and transactions sets the context.

It was the usual course of business for Balcor to enter into negotiations with local builders and developers with regard to the construction of real estate projects that would ultimately be acquired by a Balcor-created limited partnership. Often, the limited partnership would not be created until after all terms and conditions of the deal had been fully negotiated and agreed upon by the developer and Balcor. In most such instances, funding for the purchase would come through a Balcor investment fund, which frequently acted as the general partner for the purchase.

In 1981, Piedmont and Balcor entered into a series of agreements for the construction and purchase of Park Lake Apartments. Balcor formed an Illinois limited partnership, Park Lake Associates, Ltd. (Lake Associates) to purchase the apartments and created BRI to be the general partner of the general partner of the purchaser. Builder/ developer Piedmont created a wholly-owned corporate subsidiary, Lake Apartments, to function as seller/manager of the project. Lake Apartments as seller, Lake Associates as buyer, and Piedmont as guarantor entered into a purchase agreement and closing was on March 2, 1981.

Article XIV of the purchase agreement was labeled "Brokerage Commissions" and provided in part: "Seller represents that it has dealt with no brokers other than BRI Partner-81 ('BRI'), in connection with said sale. Seller has agreed to pay to BRI commissions in the aggregate amount of $631,825.00, on account of this transaction as follows: $601,825.00 on November 1, 1981, and $30,000.00 on August 31, 1983."

Similarly, in 1983, Piedmont and Balcor entered into a series of agreements for the construction and purchase of Park Colony Apartments. To effect this project, Balcor created the Illinois limited partnership, Park Colony Investors, Ltd. (Colony Investors) to buy the apartments, with the corporation Balcor Partners as the sole general partner. Piedmont, again as builder/developer, created a wholly-owned subsidiary and Georgia limited partnership, Colony Apartments, to be the seller/manager of the project. This transaction likewise included a purchase agreement between Colony Apartments as seller, Colony Investors as buyer, and Piedmont as guarantor. It closed on May 23, 1983.

Section 14.3 of Article XIV of the agreement provided in part: "Seller has agreed to pay to Balcor Partners a fee in the amount of

$962,260.00 on account of this transaction (the 'Acquisition Fee'), said Acquisition Fee to be due and payable April 1, 1985."

The agreement also provided for, and the parties executed, a "Management and Cash Flow Guaranty Agreement" whereby Colony Apartments agreed to manage the Park Colony Apartments. There was also a "Sub-Management Agreement" under which Balcor affiliate, Balcor Management was to actually manage the property.

Management fees to Balcor Management for Colony were $51,390 in 1984, $83,383 in 1985, and $81,749 in 1986, a total of $216,522. Pursuant to the "Management and Cash Flow Guaranty Agreement," Colony Investors paid Piedmont's Colony Apartments incentive management fees totaling $2,206,891 for 1984, 1985, and 1986.

Several years after Colony, Piedmont and Balcor undertook a third apartment project, which was financed and managed in a similar fashion. A dispute arose over the management by Balcor Management of this third project, resulting in a 1987 federal suit by Piedmont against Balcor Management. In late October 1987, wholly-owned subsidiaries Colony Apartments and Lake Apartments merged into Piedmont. During the course of the dispute, in mid-1987, Piedmont learned that no Balcor entity held a Georgia real estate license.

On May 4, 1988, Piedmont filed the present two actions, one seeking, among other things, the $631,825 in "brokerage commissions" to BRI in the Lake transactions (Balcor Management, originally a defendant, was voluntarily dismissed without prejudice), and the other seeking, in part, the $962,260 "acquisition fee" to Balcor Partners as well as the $216,522 management fees to Balcor Management on the Colony project. The basis for the suits was the contention that the Balcor affiliates were not or should not be entitled to the fees because the entities were not licensed under the Georgia real estate laws.

The parties filed cross-motions for summary judgment in both actions and the trial court entered the appealed-from consolidated order granting judgment to the Balcor defendants and denying it to plaintiff Piedmont. The linchpins of Piedmont's argument below were *Drake v. Parkman*, 79 Ga. App. 679 (54 SE2d 714) (1949) and *Grant v. Elder*, 146 Ga. App. 64 (245 SE2d 341) (1978). In its order, the trial court discussed *Drake* and *Grant* and concluded that they should not be "strictly applied" in the cases at bar.

Piedmont's argument is that the court fundamentally misapplied the law as stated in the two decisions and that it did not decide the ultimate issue of whether or not the subject activities of the Balcor affiliates in the Lake and Colony transactions required licensing under Georgia law. It urges that the uncontested facts clearly demanded a finding that licensing was required, entitling it to summary judgment.

1. The threshold question is the timeliness of Piedmont's claims.

The essence of both actions is the claim for money had and received, resulting in unjust enrichment. " '(T)he theory of money had and received (is) a legal remedy involving the equitable principle that one ought not in equity and good conscience retain money where he would be enriched unjustly at the expense of another.' [Cit.] Thus, recovery is authorized against one who holds the money of another which he ought in equity and good conscience to refund. [Cits.]" *International Indem. Co. v. Bakco Acceptance*, 172 Ga. App. 28, 32 (2) (322 SE2d 78) (1984). See also *Barton & Ludwig v. Thompson*, 170 Ga. App. 187, 188 (316 SE2d 786) (1984). The statute of limitation for a legal action for money had and received is four years. OCGA § 9-3-25; *Sun Fed. Savings &c. Assn. v. Manny*, 156 Ga. App. 807, 808 (2) (275 SE2d 661) (1980). Even if the actions were for breach of an implied promise of licensing, the four-year limitation would apply. OCGA § 9-3-25.

As to the Lake suit, the two payments amounting to the $631,825 in alleged "commissions" to BRI occurred on November 1, 1981, and August 31, 1983. Piedmont's action, filed May 4, 1988, was time-barred.

Likewise, any claim in the Colony suit against Balcor Management for management fees collected prior to May 4, 1984 is too late.

The four-year statute of limitation was not tolled merely because Piedmont did not discover the lack of licensing until it inquired of the Georgia Real Estate Commission in mid-1987. Assuming that licensing of the Balcor affiliates was required for the transactions, there is no evidence that the Balcor affiliates ever represented to Piedmont that they were licensed. Nor is there any evidence that Piedmont made any inquiry about licensing to defendants or to state licensing authorities prior to the parties' dispute. There is no evidence that this could not have been done earlier. There is evidence that licensing status was readily ascertainable. Reasonable diligent inquiry would have made the lack of licensing timely known to Piedmont, so the statute of limitation was not tolled. See *Bowen & Bowen v. McCoy-Gibbons*, 185 Ga. App. 298, 301 (1) (a) (363 SE2d 827) (1987).

Summary judgment to BRI in the Lake action and to Balcor Management in the Colony action for management fees collected prior to May 4, 1984 was mandated.

2. Summary judgment in favor of defendant Balcor Partners was also in order on Piedmont's Colony "acquisition fee" claim.

Even though the trial court relied on its interpretations of *Drake* and *Grant* in awarding judgment to defendants, it is not necessary to assess this application because Balcor Partners was entitled to judgment in light of the applicable statutes.

OCGA § 43-40-30 provides that "[a]ny person who, directly or

indirectly, with the intention or upon the promise of receiving any valuable consideration, offers, attempts, or agrees to perform, or performs, any single act defined in paragraph (2) of Code Section 43-40-1, whether as part of a transaction or as an entire transaction, shall be deemed a licensee within the meaning of [Chapter 40]. The commission of a single such act by a person who is required to be licensed under [Chapter 40] but who is not so licensed shall constitute a violation of [Chapter 40]."

OCGA § 43-40-1 (2) defines "broker" as "any person who, for a fee, commission, or any other valuable consideration or with the intent or expectation of receiving the same from another, negotiates or attempts to negotiate, or assists in procuring prospects for the listing, sale, purchase, exchange, renting, lease, or option for any real estate or of the improvements thereon, including persons holding themselves out as referral agents for the purpose of securing prospects for the listing, sale, purchase, exchange, renting, lease, or option for any real estate, or collects rents or attempts to collect rents, or who advertises or holds himself out as engaged in any of the foregoing. Broker also includes:

"(A) Any person employed by or on behalf of the owner or owners of lots or other parcels of real estate at a salary, fee, commission, or any other valuable consideration to sell such real estate or any part thereof in lots or parcels or other disposition thereof;

"(B) Any person who engages in the business of charging an advance fee or contracting for collecting of a fee, other than an advertising fee, in connection with any contract whereby he undertakes primarily to promote the sale of real estate either through its listing in a publication issued primarily for such purpose, or for referral of information concerning such real estate to brokers, or both;

"(C) Any person who, for another, auctions or offers or attempts or agrees to auction real estate; or

"(D) Any person who, for another, buys or offers to buy, sells or offers to sell, or otherwise deals in options to buy real estate."

"Person" as used in Chapter 40 means individuals, corporations, and partnerships. OCGA § 43-40-1 (6).

The undisputed evidence shows that Balcor Partners did not function as a broker in the Colony transaction.

There was no factual showing that the $962,260 was a brokerage commission. The parties' contract termed the sum an "acquisition fee," differentiating it from a brokerage commission. Although Piedmont's president and director, Bregman, made the conclusory statement in affidavit that the $962,260 payment was made in the belief that it constituted brokerage commissions, there was absolutely no factual showing that this was the true nature of the payment.

In contrast, Balcor Partners submitted the affidavit of Balcor's

former first vice-president/acquisitions, Kalb. It detailed the following circumstances of the subject payment. Balcor Partners performed no activities in connection with Colony which could be called brokerage activities. In Balcor terminology and business practices, an acquisition fee was not a real estate brokerage commission but was considered to be the investment fee paid by the limited partnership to its general partner for services relating to the management of the investment fund. During negotiations with Piedmont, it was made clear that the inclusion of the obligation to pay the acquisition fee to the general partner would not affect the net compensation received by Piedmont in consideration for the sale of the Colony project. Piedmont did not even learn of the exact amount of the proposed acquisition fee until shortly before the date of closing. The basic terms of the purchase and sale were negotiated prior to closing and were reflected in a November 1982 commitment letter. Pursuant to the letter, the project would be purchased subject to certain existing loans on which seller would remain liable to a limited period. Under the purchase agreement, seller would be paid $5,145,000 in cash over a period of years. The final purchase agreement also reflected the payment of an acquisition fee of $962,260 by seller to Balcor Partners on April 1, 1985, but the net cash amount of $5,145,000 paid to seller did not change. The cash payment due to seller on April 1, 1985, was increased by the same amount as the acquisition fee, $962,260, so that the net result to seller was a wash. Seller still received the same amount of cash $5,145,000, that had been negotiated and agreed on months before notwithstanding its subsequent agreement to pay the acquisition fee. It was made clear to Bregman and disclosed in the prospectus to the limited partners that the acquisition fee obligation would be discharged by the limited partnership by direct payment to the general partner. It was also made clear that the inclusion of the acquisition fee provision in the purchase agreement would have absolutely no effect upon the net compensation realized by Piedmont in consideration of the Colony Apartments sale.

Piedmont's bare statement that it believed the subject fee to be a brokerage commission does not stand to create a question of fact in the face of Balcor Partners' factual showing to the contrary. Kalb's affidavit established without dispute that during negotiations with Piedmont on the Colony Apartments, Kalb was the representative of any Balcor entity with whom Piedmont and its representatives dealt and that Kalb had held a Georgia real estate brokerage license since approximately 1970 and such license was in full force and effect during 1982 and 1983.

The factual showing conclusively undermines Piedmont's contention that Balcor Partners acted as a "broker" as contemplated by the statute and that the "acquisition fee" was a brokerage commission.

The undisputed material fact is that the sum as characterized in the documents was for the purpose of a pass-through on the balance sheet of the transaction and did not accurately reflect the true nature of the payment.

3. Likewise, an examination of the evidence which establishes undisputed facts regarding defendant Balcor Management's fees vis-a-vis the licensing statutes required judgment for Balcor Management on Piedmont's remaining claims.

OCGA § 43-40-29 provides exceptions to operation of the requirements of Chapter 40. The chapter does not apply to "[a]ny person employed on a full-time basis by the owner of property for the purpose of selling, buying, leasing, managing, auctioning, or otherwise dealing with such property."

Colony Investors, the Balcor limited partnership which owned Colony, engaged Piedmont's wholly-owned subsidiary and limited partnership Colony Apartments to manage the property under the executed management and cash flow guaranty agreement. In turn, Colony Apartments, owner Colony Investors, and Piedmont as guarantor executed the sub-management agreement with Balcor Management making Balcor Management "the sole and exclusive agent" of Colony Apartments "to maintain, operate, management, supervise, rent and lease the Property." Balcor Management was actually responsible for the day-to-day management of Colony.

The fund manager responsible for Colony Investors' investment in Colony swore in affidavit that Colony Apartments was paid a 5% monthly management fee which was passed on to Balcor Management because of the delegation of management duties. The affidavit of the first vice-president of Balcor Management added the following. Balcor Management was engaged in the apartment management business. To the best of his knowledge, prior to 1987 the only apartment projects which Balcor Management managed were owned by limited partnerships, the general partners of which were The Balcor Company or one of its affiliates. Balcor Management managed such complexes as the management arm of The Balcor Company. On or about October 14, 1987, Balcor Management obtained a Georgia real estate license because it wanted to expand its management services to apartment complexes owned by non-Balcor entities. Prior to that time, Balcor Management did not have a license because it only managed apartment complexes owned by Balcor entities.

The uncontroverted evidence was that Balcor Management was employed directly or indirectly by the Balcor-owner of the property to perform the daily management duties at Colony. As such it was excepted from the licensing requirement. OCGA § 43-40-29 (a) (8).

Thus the Balcor defendants were entitled to judgment in their favor as a matter of law and plaintiff Piedmont was not. Inasmuch as

we will affirm the judgment of the court below if it is right for any reason, see *Health Help Svcs. of Gainesville v. State Health Planning Agency*, 174 Ga. App. 640, 641 (1) (329 SE2d 628) (1985), the trial court's judgment stands.

*Judgment affirmed. Deen, P. J., and Pope, J., concur.*

DECIDED JULY 6, 1990 —
REHEARING DENIED JULY 23, 1990 — CERT. APPLIED FOR.

*Glass, McCullough, Sherrill & Harrold, L. James Weil, Jr., Robert S. Jones, Evert & Weathersby, Michael N. Weathersby*, for appellant.

*Sutherland, Asbill & Brennan, William D. Barwick, Alfred A. Lindseth*, for appellees.

*Edward C. Stone, Quinton S. King, Trotter, Smith & Jacobs, Gerald L. Baxter*, amici curiae.